505 So.2d 902 (1987)
J.S. LEE, Plaintiff-Appellee,
v.
Verlee MANNING, Defendant-Appellant.
Verlee MANNING, Plaintiff-Appellant,
v.
GULF SOUTH CAPITAL, INC., Defendant-Appellee.
Nos. 18585-CA, 18586-CA.
Court of Appeal of Louisiana, Second Circuit.
April 1, 1987.
*903 Levy, James & Shealy by Robert W. Levy, Rushton, for J.S. Lee and Gulf South Capital, Inc.
Shotwell, Brown & Sperry by Francis C. Broussard, and George Wear, Jr., Monroe, for Verlee Manning.
Before HALL, C.J., and MARVIN and NORRIS, JJ.
HALL, Chief Judge.
J.S. Lee filed a partition suit in 1981 against his former wife, Verlee Manning, seeking to be declared the owner of an undivided one-half interest in a forty acre tract of land located in Ouachita Parish acquired in the wife's name during the existence of the community of acquets and gains established by their marriage in 1953. In a separate proceeding, which was consolidated for trial with the partition action, Mrs. Manning sought to cancel a sale by her former husband of his interest to the minerals in the forty acre tract of land to Gulf South Capital, Inc. on the grounds that the tract of land was her separate property. Prior to trial, Lee died and his daughter, Delores Rhodes, was substituted as party plaintiff. After trial, the district court found the former wife failed to overcome the presumption that property acquired during marriage is community property. Judgment was rendered recognizing Delores Rhodes as the owner of an undivided one-half interest in the property, subject to a mineral deed from Lee to Gulf South Capital, Inc., and rejecting Verlee Manning's demands against Gulf South. From this judgment, Mrs. Manning appealed.
*904 The question involved is whether the forty acre tract of land was community property or the separate property of the wife.
Lee and Manning were married twice, once in August, 1953 and again in July, 1954 after a problem with Lee's divorce from a previous wife was resolved. Three weeks after their remarriage, Mrs. Manning acquired the property in dispute for $3,000.00 cash. In the act of sale the purchaser was designated as "Verlee Richardson, a divorced woman." Mrs. Manning borrowed $1,800.00 of the purchase price from Mason and Pearson Mortgage Company and agreed to repay the loan in monthly installments of $40.00. Manning candidly stated that the installment notes were paid primarily from her earnings as a schoolteacher. The source of the $1,200.00 down payment is in dispute. The background facts are recited in greater detail in the trial court's written reasons for judgment, a copy of which is attached as an appendix to this opinion.
A strong presumption exists that all property acquired by either spouse during the existence of their marriage becomes an asset of the community. Former LSA-C.C. Arts. 2334, 2402, and 2405 (See revised Art. 2340). Houghton v. Hall, 177 La. 237, 148 So. 37 (1933); Perkins v. Ray, 365 So.2d 1189 (La.App. 3d Cir.1978). The burden of overcoming the presumption of the community nature of property acquired during marriage rests upon the party asserting its separate and paraphernal nature. To satisfy this burden of proof the evidence must be clear, positive, and legally certain. Succession of Adger, 457 So.2d 146 (La.App. 2d Cir.1984). In evaluating the evidence, some allowance must be made where the purchase occurred many years prior to the assertion of a claim. Southwest National Production Co. v. Anderson, 239 La. 490, 118 So.2d 897 (1960). See also Cooper v. Heirs of Cooper, 421 So.2d 314 (La.App. 1st Cir.1982).
In order to establish the separate or paraphernal nature of immovable property acquired during the community in her own name, a wife must prove (1) the paraphernality of funds used for the purchase; (2) her individual administration of the funds; and (3) her investment of the money. Curtis v. Curtis, 403 So.2d 56 (La.1981).
Under the jurisprudence prior to 1981, in the case of a purchase on credit the wife also had to prove that the property afforded sufficient security for the credit portion, and that she had sufficient separate revenue to be reasonably certain of being able to meet the deferred payments. Monk v. Monk, 243 La. 429, 144 So.2d 384 (1962). In Curtis v. Curtis, supra, the Supreme Court eliminated this requirement in light of modern economics and social realities, holding that where the wife initially acquires property solely with separate funds used for the down payment, the property is her separate property and if she later uses community funds to pay the credit portion of the purchase price, her separate debt, she is obligated to reimburse the community for that amount. See Spaht, Matrimonial Regimes, Developments in the Law, 1980-81, 42 La.L.Rev. 347 (1981) and Comment, Curtis v. Curtis: An Unsettling Community Property Precedent, 28 Loy.L. Rev. 315 (1982).
The transaction in this case was actually a cash sale for $3,000.00. However, the evidence shows that Mrs. Manning financed $1,800.00 of the purchase price through a mortgage loan payable in monthly installments. We perceive no difference between this kind of transaction and a purchase on credit.
Accordingly, the inquiry in this case focuses on the source or nature of the $1,200.00 cash paid by Mrs. Manning for the purchase of the subject property. There is little or no evidence to support a conclusion that the funds used by her to purchase the property were her separate funds.
Mrs. Manning did not testify that she had accumulated any savings or separate funds prior to her marriage to Lee. The only indication of that is her testimony that she had $2,000.00 available to try to save the property during the foreclosure proceedings, which commenced about the time of or shortly after her first marriage *905 to Lee. This testimony, however, was extremely vague and indefinite and there was no evidence that she retained those funds separate from her earnings after her marriage. During the year after her marriage until the time of the purchase of the property, Mrs. Manning, according to her testimony, had income of several thousand dollars, consisting primarily of her teaching salary and rental income, all of which belonged to the community as an effect of the marriage, whether valid or putative. Former LSA-C.C. Arts. 2334 and 2386; LSA-C.C. Arts. 117 and 118; Succession of Adger, supra.
There is simply no substantial evidence, not even Mrs. Manning's own testimony, that the cash portion of the sales price was paid entirely, or even partially, with funds that were legally classified as her separate funds. Although perhaps not relevant under the Curtis v. Curtis decision, it is clear that the credit portion was repaid out of her earnings which were community funds, at least until the parties separated sometime between 1956 and 1959. The trial court correctly found that the parties were not living separate and apart in the legal sense prior to 1956 even though they seldom stayed together because of Lee's stay in the hospital, attendance at L.S.U., and teaching in various areas, while Mrs. Manning taught school in Monroe. They maintained a marital relationship during that time. Former LSA-C.C. Art. 2334.
Mrs. Manning failed to prove that the property was acquired with her separate funds. The judgment of the district court is correct and is affirmed, at appellant's costs.
AFFIRMED.

APPENDIX

REASONS FOR JUDGMENT
Suit Number 128,823 was originated by petition for partition filed on September 25, 1981, by Joseph Lee against his former wife, Verlee Manning, concerning a forty-acre tract in Section 25, T17N, R1E, in southwest Ouachita Parish. The petition alleged that the property was acquired during the marriage, that each owns a one-half interest in indivision and that the property is divisible in kind. He died after filing suit, and his daughter, Delores Rhodes, was substituted as plaintiff.
Suit Number 83-4061 is a suit [by] Verlee Manning against Gulf South Capital, Inc., seeking to void and cancel a mineral deed from Lee to Gulf South executed on January 23, 1981. Manning contends that the property was purchased by her with separate funds under her separate administration for her separate estate and that it has so remained since purchase without prior claim by Lee. The cases were consolidated for trial, heard on April 21, 1986, and taken under advisement.
The testimony and documentary evidence reveal the chronology of events. Joseph Lee was previously married to Arline Reynolds, who later lived in Chicago. He then married Mary Buford, who divorced him in June, 1952.
Verlee Manning, born Young, was previously married to and divorced from one Richardson. Her father, John Young, owned the subject property in Section 25, as well as an additional forty in Section 30 situated corner-to-corner with the subject forty. He and his family at one time lived on the subject property; but he also owned some residential property in Monroe.
In late 1951 or early 1952, Lee and Manning met at Grambling State where she was completing her education and he was band director and music teacher. In July, 1952, Lee was hospitalized at Veterans Hospital in Temple, Texas, with tuberculosis (as well [as] diabetes); and Manning visited him there. She took possession of his car and later traded it to purchase another in her own name. In May, 1953, while he was on pass from the hospital and they were visiting his brother, Lee and Manning were married. Lee returned to the hospital.
In July, 1953, John Young executed a deed to "Verlee Richardson, a divorced *906 woman" covering the tract in Section 30, and some lots in Monroe. It recited cash consideration of $3,000. In October, 1953, a judgment was rendered against John Young in favor of Motors Securities Company, which seized the subject property under a writ of fi.fa. and bought it at a sheriff's sale on February 20, 1954. Motors Securities sold it to E.J. Davidson (Young's original creditor) on March 4, 1954.
In the meantime, Lee had decided he could not return to band directing and teaching when released from the hospital and applied for a government subsidy to do graduate studies at L.S.U. He was required to produce evidence of his divorce from Arline Reynolds and could not do so. He and Manning went to Houston and located his daughter, Delores, who promised to contact her mother.
In a letter to Lee postmarked Chicago on January 16, 1954, Arline Reynolds wrote that she had obtained a divorce in 1929 but records had been destroyed by fire; that she had been informed that it may be of doubtful validity because she had not attended court; that she was re-filing at that time. A divorce was granted in Chicago on May 19, 1954; and on July 8, 1954, Lee and Manning were again married in Mississippi.
On July 30, 1954, a deed was executed from E.J. Davidson to "Verlee Richardson, a divorced woman" selling the subject property for a recited cash consideration of $3,000. A mortgage of the same date from Verlee Richardson to Mason & Pearson, Inc., covered both the subject property and the forty acres in Section 30. Manning and the mortgag[ee] testified that Manning paid part of the selling price herself and borrowed the remainder.
In August, 1954, Lee was discharged from the hospital, and he entered L.S.U. in September. He listed John Young as his "guardian" and the residence of Young and Verlee on Jackson Street in Monroe as his home address. He taught school at Tallulah, Rayville and Chatham thereafter. Manning taught regularly in the Monroe City school system from 1952 until her retirement.
On March 11, 1955, John Young and his wife executed a deed to Joseph and Verlee Lee covering the Jackson Street resident in Monroe. On May 28, 1955, Joseph and Verlee Lee were vendees in a deed from Julia and Sullivan Hill covering other residential property in Monroe.
On November 20, 1956, a divorce decree was rendered in favor of Lee by the Chancery Court of Coahoma County, Mississippi. On October 27, 1959, a divorce was rendered in favor [of] Manning from Lee by the district court in Ouachita Parish. On that same date Lee quitclaimed to Manning all his interest in the Monroe residential property acquired in 1955 for a recited $500 cash "and other good and valuable consideration."[1]
On April 16, 1973, Manning (then named as "Verlee Richardson German, wife of Izea German") granted a mineral lease on both the subject property and the forty in Section 30 to Forman Exploration Company (which she ratified as still in effect on February 6, 1981). On December 4, 1975, she sold timber on the same property to W.D. Ivey.
At some time in late 1980 or early 1981, activity looking toward exploration in Section 25 began; and on January 23, 1981, Lee executed the mineral deed to Gulf South. A producing well was completed in December 1981, on the subject forty, which was referred to in argument as one of the "best gas wells in this vicinity."
The records of Ouachita Parish reveal that the subject property has been assessed to Verlee Richardson since 1954; and she testified without contradiction that she has paid all taxes, mortgage notes and other charges on the property since that time.
*907 The documentary evidence clearly establishes a valid marriage and a community regime between Lee and Manning at the time of the deed to Manning; and the deed itself does not prove separate status. Hence, the property was presumed to be in the community. Her adversaries rely upon that presumption; and the sole issue for decision is whether Manning has borne the burden of overcoming it.[2]
She contends that the documents and chronology just recited clearly reveal her intention to acquire "family home" property for her separate estate and that only the passage of more than 25 years before Lee made claim has prevented her from producing all documentary evidence to support her testimony. She swore that from at least 1951 forward, she was getting child support for herself and son from Richardson and then teaching, saving money and investing, while Lee was hospitalized, unemployed with no income until after he left L.S.U. She further swore that although they were still married, they did not in fact live together except for occasional short visits.
A discovery deposition taken from Lee by Manning's previous counsel shortly after suit was filed and shortly before his death dealt primarily with family and marital history and did not delve substantially into affairs between Lee and Manning as related to the property, or into his financial contributions to the marriage. Hence, Manning's argument seems persuasive, particularly with respect to her payment of all monies.
However, a number of aspects of the evidence counter her contentions. First, her total testimony and her earlier discovery deposition convince the Court that there was considerably more (and more frequent) relationship between the parties than Manning argues and that they were not "living apart" in the sense required to constitute her earnings separate property. Hence, all her wages from May, 1953, were community property. Moreover, Lee was drawing a veteran's pension while hospitalized and a government subsidy while at L.S.U.; and he taught school thereafter. He was not as impecunious as she asserts.
Further, if Manning did in fact pay her father $3,000.00 cash for other property in July, 1953, and, in addition, lend him money on the subject property,[3] a serious question is presented as to the extent of her savings on a teacher's salary.[4] Even if she did maintain control over her salary in a separate bank account and pay taxes and mortgage notes therefrom, the presumption of community status applies to those funds.
In addition, there was the purchase of some property from her father in 1955 (after Lee had left both the hospital and L.S.U.) in the name of both parties as man and wife. Such a procedure was inconsistent with her stated purpose of preserving all family property to herself.
There was also the letter which Manning wrote to Lee when he was in Baton Rouge which clearly implies an earlier "claim" by him relating to the car she had traded and the subject property. In that letter she made reference to the fact that "my other 40A." (presumably in Section 30) was mortgaged with the subject property, and the fact that $1,687.30 was owed on that mortgage. It cannot be overlooked that Lee was aware of the purchase in her name while he was not present and was making some kind of claim to a community interest.
*908 Finally, and perhaps most cogent, there was the testimony of Major Young, Verlee Manning's uncle, who lived adjacent to the subject property. Although 93 years of age and quite feeble, this witness displayed remarkable mental clarity, responding quickly, alertly and intelligently. In his niece's presence, he testified that when his brother John Young lost the subject property in the sheriff's sale, he himself wanted it and he inquired of Verlee and her parents if they intended to "redeem" it. He said they told him there were not able to do so or interested, and they consented to his purchasing it.
The witness stated that he went to Mr. Davidson, then owner, but "he wouldn't even talk with me." Later, he said Verlee and "Brother" Lee came to his home and stated they wanted to try to "redeem" the property and he consented to withdraw his own desire. He testified that on many occasions he discussed the property with Lee who had varying ideas about what use could be made of it. He is the person who sent the land man to Joseph Lee when inquiry was made of him about ownership of the subject property because he thought Lee and Manning owned it together.
These total facts are just as consistent with the contention that the property was taken in Verlee's name to preserve it from some kind of income tax difficulty Lee had, or with the suggestion that Verlee may have been attempting to "sidestep" Lee as she apparently did with his car while he was hospitalized, as they are with her contentions. They fall short of overcoming the legal presumption of community status.
Accordingly, in suit number 128,833, the Court is obliged to hold that plaintiff is owner in indivision with Verlee Richardson Manning of a one-half interest in the subject property (subject to the mineral deed executed by Lee to Gulf South Capital in 1981) and will order a partition in kind.[5] In suit number 83-4061, the demands of plaintiff will be rejected and her suit dismissed at her cost.
NOTES
[1] Manning's petition in her divorce suit here listed this as the only community property. This quitclaim deed was later referred to by her and her counsel as a "community property settlement," but it did not so state.
[2] Originally, Manning alleged that her marriage to Lee was invalid because he was not divorced from Arline Reynolds. His good faith reliance upon earlier representations by Reynolds of a divorce seems clearly supported by her letter of January, 1954. Even so, a "second" divorce was obtained and a "second" marriage between Lee and Manning was observed and consummated. Although she contends she had been negotiating for the property earlier, it was not acquired until after the second marriage on July 8, 1954. Her other alternative pleas of estoppel and acquisitive prescription were not seriously urged and are not supported by the evidence.
[3] In the process verbal of the sheriff's sale of the subject property in February, 1954, she was listed as the mortgagee of an inferior special mortgage by Young as mortgagor.
[4] A document in the records shows her salary in 1952 to be $3,000.00 annually.
[5] At the conclusion of the trial, counsel for all parties stated that they felt they could agree amicably on a partition if ordered and requested the Court to delay formal action in that respect. It may be that some of Manning's payments and/or "investments" in the property are to be asserted in the partition as "credits" due her.